# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**KAREN MARLENE NICHOL,**                    Case No. 5:18 CV 1795

      Plaintiff,

      v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                           MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Karen Marlene Nichol ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in July 2015, alleging a disability onset date of November 25, 2011. (Tr. 200-01). Her claims were denied initially and upon reconsideration. (Tr. 80, 99). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 135-36). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 6, 2017. (Tr. 38-79). On December 28, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19-30). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on August 3, 2018. (Doc. 1).

FACTUAL BACKGROUND

Personal Background & Testimony

Born in 1969, Plaintiff was 47 years old on her date last insured. *See* Tr. 29, 44, 200. She had a college education (Tr. 46) and past work as an office clerk (Tr. 73). She stopped working due to her medical conditions (pain, stomach issues, and frequent doctor's appointments). (Tr. 47-48).

In August 2015, Plaintiff reported she could "walk a couple of miles for exercise" and although she was "always uncomfortable" could "stand for awhile." (Tr. 87). Plaintiff was "active in her church, visits members and teaches little children"; she also "baby[sat] for friends." *Id.*

At the time of the September 2017 hearing, Plaintiff lived in a multi-story house with her adult children. (Tr. 45). Plaintiff drove frequently, but her father drove her to the hearing because she had difficulty driving in cities. (Tr. 46). Plaintiff stated that her primary source of pain was lupus (which caused joint pain) and fibromyalgia (which caused back, neck, shoulder, and hip pain, as well as pelvic floor dysfunction). (Tr. 51). Physical therapy and injections helped somewhat with her pelvic floor pain. (Tr. 52).

Plaintiff described a typical day as lying in bed, stretching, taking medication, taking care of her animals, starting laundry or dishes, showering, and resting. (Tr. 53). Plaintiff's son had ADHD and borderline Asperger's and she was trying to help him find a job. (Tr. 54). Plaintiff had two dogs and two cats; she walked the dogs "on occasion". (Tr. 55). Plaintiff's daughter vacuumed, and her son helped with carrying heavier loads of laundry and the yardwork, though Plaintiff could do a little; Plaintiff cooked, grocery shopped, washed dishes, and handled lighter loads of laundry

(Tr. 56). She attended a morning gentle yoga class for three months, but stopped for financial reasons. (Tr. 56). She went to church on Wednesday evenings (teaching a thirty-minute children's class) and Sundays. (Tr. 57).

Plaintiff had good days and bad days, depending on flares. *Id.* On average, she had two bad days per week. *Id.*

Plaintiff testified she could lift a gallon of milk, and reach overhead, but lifting heavier items caused pain. (Tr. 58-59). She estimated she could stand for 30 minutes to an hour before having to sit down. (Tr. 63). In 2015, she did a two mile walk for lupus, but at the time of the hearing estimated she could walk a half mile without stopping, but not a mile (Tr. 64). Plaintiff also estimated she could sit for an hour before having to stand up. *Id.*

After physical activity, Plaintiff had increased pain and stiffness in her neck and shoulders, or hips if she walked too much. (Tr. 65). Plaintiff also testified to difficulty hearing when there was background noise. (Tr. 69-70).

Plaintiff testified she was diagnosed with memory loss by Dr. Obrockee. (Tr. 60). She forgot appointments, names, and tasks. (Tr. 60-61). Plaintiff used alerts on her smart phone to remember to take medication. (Tr. 70).

<u>Relevant Medical Evidence</u>

*Physical Health*

Prior to her alleged onset date, Plaintiff was diagnosed with, and began treatment for, lupus. *See, e.g.*, Tr. 689. At a follow up appointment in December 2010, Plaintiff reported her medication seemed to be working with decreased pain, swelling, stiffness, and fatigue. *Id.* Marie Kuchynski, M.D., noted Plaintiff's lupus was "improving". *Id.* In March and June 2011, Plaintiff had no worsened stiffness, swelling, or pain (Tr. 685-86); in June, she reported right arm and hand

numbness. (Tr. 685). In September 2011, Plaintiff experienced a lupus flare with "[l]ots of muscle and joint pain" as well as oral ulcers, rashes, and mental symptoms (confusion, memory loss, and insomnia). (Tr. 684). Plaintiff went to the emergency room later that month, reporting a lupus exacerbation including chest wall pain, back pain, and generalized weakness. (Tr. 314). Plaintiff was given medication and discharged with instructions to follow up with her rheumatologist. (Tr. 316). With medication, Plaintiff began to feel better in October, but was not sleeping well and had joint aches. (Tr. 683). In November, Plaintiff reported hypersensitivity to bright lights and loud noises, but had "[n]o other lupus symptoms."; Dr. Kuchynski noted Plaintiff's lupus was "otherwise stable". (Tr. 682).

Plaintiff continued to treat with Dr. Kuchynski in 2012. In January, she reported no worsening, and that her medications controlled her symptoms. (Tr. 676). The same was true in April, and Plaintiff noted her neuropathy pain was "lessening somewhat with Elavil". (Tr. 674). Dr. Kuchynski found nodules on Plaintiff's feet and referred her to podiatry. *Id.* Her impression was that Plaintiff's lupus was "stable on therapy". *Id.* Dr. Kuchynski noted similar findings in July, that Plaintiff's neuropathy was "slowly improving" and she "no longer ha[d] intense burning."; her lupus was "stabilizing on therapy" (Tr. 445). Dr. Kuchynski made similar notes in October. (Tr. 444) ("no worsening stiffness or swelling"; "[p]ain has not worsened"; "[m]edications are working to keep [symptoms] under control"; "[s]till has neuropathy pain but it has lessened").

In May 2012, Plaintiff underwent a brain MRI due to her history of lupus and facial paresthesias. (Tr. 1626). The impression was: "[n]onspecific bihemispheric white matter changes not significantly changed compared to prior examination dated 12/15/2011." *Id*.

Plaintiff also saw Dr. Kuchynski three times in 2013. *See* Tr. 437-38, 668. In March, Plaintiff continued to report that her medications kept her symptoms under control. (Tr. 438). The

same was true in July, but Plaintiff "[s]till ha[d] a lot of neuropathic pain" and was "unable to work due to the fact of the pain and also with memory problems and needs lots of reminders." (Tr. 437). In November, Plaintiff continued to report no worsening, though she thought she had a flare two months prior. (Tr. 668). Examination findings at these visits were normal, and Dr. Kuchynski noted Plaintiff's lupus was "stable on therapy". (Tr. 437-38, 668).

Plaintiff returned to Dr. Kuchynski in March 2014. (Tr. 1170-73). She reported worsened memory loss, but stable joint pain, malaise, and skin conditions. (Tr. 1170). Her physical examination was unremarkable and Dr. Kuchynski continued Plaintiff's medications. (Tr. 1171-73). Dr. Kuchynski noted Plaintiff's lupus was stable but she "[h]a[d] memory loss which causes inability to be gainfully employed." (Tr. 1172). In May, Plaintiff was "having a lot of lupus complaints". (Tr. 882). She had a "marked" increase in neuropathic pain, and it was "unrelenting". *Id.* Plaintiff also had bladder pain and unexplained hives. *Id.* Examination revealed paresthesia. (Tr. 883). In July, Plaintiff presented with an allergic reaction. (Tr. 650). Her examination again revealed paresthesia. (Tr. 651). Dr. Kuchynski referred her to an allergist. (Tr. 654). In September, Plaintiff was feeling better (Tr. 643), and Dr. Kuchynski diagnosed stable lupus (Tr. 648).

In May 2014, Plaintiff underwent MRIs of her lumbar and thoracic spines (Tr. 843-45). The lumbar spine MRI revealed: partial sacralization of the L5 vertebral body, left paracentral disc herniation at the L5-S1 level, and mild degenerative changes at the L4-L5 level. (Tr. 843). The thoracic spine MRI revealed a Schmorl's node involving the superior and plate of T11 but was otherwise unremarkable. (Tr. 845).

In August 2014, Plaintiff went to the emergency room with chest pain. (Tr. 399). The pain lasted approximately one hour and resolved with nitroglycerin. *Id.* She was discharged the following day with diagnoses of chest pain syndrome, lupus, and unspecified insomnia. (Tr. 414).

When Plaintiff returned to Dr. Kuchynski in January 2015, she reported doing well, but that her nerve pain was worse, and her bladder pain continued. (Tr. 864). On examination, Dr. Kuchynski noted hyperesthesia. (Tr. 868). She observed Plaintiff's lupus was stable "but neuropathy pain is much worse and [patient] has persistent peripheral edema." (Tr. 869). A note in Plaintiff's lab results from this month states: "labs are all stable without signs of severe active flare." (Tr. 921). In May, Dr. Kuchynski noted Plaintiff's lupus was stable and her neuropathic pain was "starting to respond to gabapentin" (Tr. 636); Plaintiff's labs were stable (Tr. 920). At a September 2015 appointment, Plaintiff was "doing fairly well", and had not "increased the gabapentin yet but knows that may further help her pain." (Tr. 1114). Dr. Kuchynski continued to note hyperesthesia in May and September. (Tr. 635, 1118).

In January 2016, Plaintiff told Dr. Kuchynski she was doing well; gabapentin was partially helping and she requested a higher dose. (Tr. 1108). However, she had developed severe degeneration in her jaw for which she had an upcoming surgery, and she hurt her shoulder. *Id.* Examination continued to reveal hyperesthesia. (Tr. 1112).

In February 2016, Plaintiff had a left shoulder MRI which revealed partial undersurface tearing of the supraspinatus tendon without evidence of full thickness tear, intact remaining rotator cuff tendons, and mild acromioclavicular arthrosis. (Tr. 1158-59).

A May 2016 note states that Plaintiff's "labs [were] all stable without signs of increased activity or signs of a flare." (Tr. 1301).

A July 2016 brain MRI revealed small scattered nonspecific white matter changes within the cerebral hemispheres bilaterally which were similar in appearance to the May 2012 MRI. (Tr. 1256). The interpreting physician noted that "[w]hile nonspecific, white matter changes can be seen with small vessel ischemic change or demyelinating processes among others." *Id.*

In September 2016, Plaintiff received a trigger point injection to treat chronic pelvic pain. (Tr. 1470). That same month, Dr. Kuchynski again noted Plaintiff's labs were stable. (Tr. 1314).

In September and October 2016, at physical therapy visits for pelvic pain, right hip pain, and sacroiliitis, Plaintiff reported an occupation of "volunteer at church and caregiver" (which the records note to be "full time") and that she drove two to three hours per day. (Tr. 1524, 1526).

After her date last insured of December 30, 2016, Plaintiff continued to treat with Dr. Kuchynski. In January 2017, she reported a burning sensation. (Tr. 1557). On examination, Dr. Kuchynski noted hyperesthesia and "some jerking movements". (Tr. 1561). Plaintiff also had limited shoulder range of motion due to pain. *Id.* Dr. Kuchynski noted similar physical findings at a May 2017 visit. *See* Tr. 1549-54.

In March 2017, Plaintiff presented for a follow-up of fibromyalgia and neuropathy. (Tr. 1418). Deborah Ewing-Wilson, D.O., noted Plaintiff was "[e]ating right, exercising and doing yoga", but generally had pain in her shoulders and trunk. *Id.* Dr. Ewing-Wilson diagnosed small fiber neuropathy and fibromyalgia. (Tr. 1423). She noted Plaintiff was "[o]verall stable" and instructed her to follow up in three months. *Id.* In May, Dr. Kuchynski noted Plaintiff had "some degeneration of TMJ and planned for surgery." (Tr. 1549). Dr. Kuchynski noted similar physical findings to her January 2017 examination. (Tr. 1553-54). At a July 2017 physical therapy appointment, Plaintiff reported being "very physically active" since her prior appointment ("hauling wood"), and had been stretching and walking, but not doing yoga. (Tr. 1694).

*Physical Health Opinion Evidence*

In May 2012, Dr. Kuchynski completed an autoimmune disease questionnaire for the State agency. *See* Tr. 361-63. Dr. Kuchynski noted physical findings of irregular heart rate, abdominal pain, nausea, rashes, sun sensitivity, joint pain, back pain, neuropathy, memory loss, dry eye, dry

mouth, fatigue, and oral ulcers. (Tr. 362). She referred to her records to explain Plaintiff's history

laboratory results and studies, and restrictions of daily activities. *See id.* She noted Plaintiff had

difficulty with activities of daily living, no difficulty with social interactions, and that it "takes

longer [for her] to work". (Tr. 363).

In November 2015, State agency physician Michael Lehv, M.D., reviewed Plaintiff's

records and offered an opinion about her functional abilities. (Tr. 94-96). He opined Plaintiff could

lift or carry up to twenty pounds occasionally, and ten pounds frequently; she could stand or walk

about six hours in an eight-hour workday, and sit for more than six. (Tr. 94). He opined Plaintiff

could frequently climb ladders, ropes, and scaffolds, and had no limitation climbing ramps or

stairs. (Tr. 94-95). She could frequently kneel, and occasionally stoop, crouch, or crawl. (Tr. 95).

He opined Plaintiff should avoid concentrated exposure to noise, and all exposure to hazards. (Tr.

96).

In March 2016, Dr. Kuchynski opined Plaintiff could not bend, stoop, walk long distances,

or perform heavy lifting. (Tr. 1106).

In April 2016, State agency physician Maureen Gallagher, D.O., M.P.H., reviewed

Plaintiff's records and affirmed Dr. Lehv's opinion of Plaintiff's functional abilities. (Tr. 111-13).

In June 2017, Dr. Kuchynski completed a residual functional capacity questionnaire. (Tr.

1576-78). Therein, she noted she had treated Plaintiff every four months since August 2010 for

lupus. (Tr. 1576). She opined Plaintiff could walk one to two city blocks, sit for twenty minutes at

one time, and stand for ten minutes at one time. *Id.* She opined Plaintiff could sit, stand, and walk

for a total of less than two hours in an eight-hour workday. *Id.* She also opined Plaintiff would

need to lie down or rest three to four times per day for twenty to thirty minutes before returning to

work. (Tr. 1577). She opined Plaintiff could frequently lift less than ten pounds, occasionally lift

ten pounds, but never lift twenty pounds or more. *Id.* She opined Plaintiff could stoop or crouch for five percent of the workday. *Id.* Plaintiff would miss work more than four times per month. *Id.*

*Mental Health*

In 2009, Plaintiff underwent an evaluation for suspected attention deficit disorder ("ADD"). (Tr. 281-84). Plaintiff reported "longstanding difficulties" with disorganization, time management, procrastination, and not completing tasks. (Tr. 281). Psychologist Michael Romaniuk, Ph.D., diagnosed attention deficit hyperactivity disorder – inattentive type and dysthymia with anxiety. (Tr. 284). He recommended medication, therapy, and a support group. (Tr. 284-85).

In June 2012, Plaintiff underwent a psychological evaluation with neuropsychologist Joshua Magleby, Ph.D. (Tr. 384-89). Dr. Magleby noted Plaintiff showed the ability to follow questions and directions and her ability to follow or carry out more complex tasks "appear[ed] to be average, as was short-term recall on mental status exam." (Tr. 389). He also noted Plaintiff's ability to maintain attention, concentration, persistence and pace appeared "fairly average". *Id.*

In December 2015, Plaintiff underwent a mental disability evaluation with Cheryl Benson-Blankenship, Ph.D. (Tr. 1099-1103). Plaintiff reported waking at 5:30 to 6:00 a.m. to exercise. (Tr. 1102). She did laundry, and took her children to work "because neither one drives at the present time". *Id.* She grocery shopped, made meals for her family, and attended church three times per week, working as a teacher's assistant on Sunday mornings. *Id.* Plaintiff also reported babysitting a three-year-old child "several times a week". (Tr. 1100). Dr. Benson-Blankenship opined Plaintiff would be able to follow instruction in a work setting, did not show distractibility, and would be able to respond appropriately to work pressures. (Tr. 1103).

<u>VE Testimony</u>

A VE appeared and testified at the hearing before the ALJ. (Tr. 71- 78) The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 73-76. The VE responded that such an individual could perform jobs such as ticket checker, document preparer, and polisher. (Tr. 76-77). The VE also testified that if a person needed to lie down and rest at unpredictable intervals throughout a workday or had to be reminded of her work tasks every two to three hours, there would be no jobs available. (Tr. 77-78).

<u>ALJ Decision</u>

In his December 2017 written decision, the ALJ found Plaintiff last met the insured status requirements for DIB on December 31, 2016 and had not engaged in substantial gainful activity from her alleged onset date of November 25, 2011 through her date last insured. (Tr. 21). He then found that Plaintiff had severe impairments of systemic lupus erythematosus, fibromyalgia, small fiber neuropathy, peripheral neuropathy, peripheral edema, degenerative disc disease of lumbar spine, pelvic floor dysfunction with urgency and frequency of urination, bilateral sensorineural hearing loss, and hyperacusis, but that none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. (Tr. 21-24). The ALJ then set forth Plaintiff's RFC through the date last insured:

> [T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with certain restrictions. Specifically, the claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs. She can frequently balance and occasionally stoop, kneel, crouch and crawl. She must avoid concentrated exposure to loud and very loud noise. She must avoid all exposure to hazards such as unprotected heights, moving mechanical parts and commercial driving.

(Tr. 24). The ALJ then found that through the date last insured, Plaintiff was unable to perform any past relevant work (Tr. 28), but given her age, education, and RFC, there were other jobs that existed in significant numbers in the national economy that she could have performed (Tr. 29). Therefore, the ALJ found Plaintiff was not disabled from her alleged onset date (November 25, 2011) through her date last insured (December 31, 2016). (Tr. 30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence because he: 1) failed to follow the treating physician rule; and 2) failed to apply the appropriate analysis in evaluating opinion evidence, specifically by given the greatest weight to non-treating, non-examining physicians. For the reasons discussed below, the undersigned finds no error.

Plaintiff first argues that the ALJ erred in not giving greater weight to the June 2017 opinion of Dr. Kuchynski. This argument implicates the well-known treating physician rule.

<u>Treating Physician Rule</u>

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[1] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in July 2015 and thus the previous regulations apply.

examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The ALJ summarized and addressed Dr. Kuchynski's May 2012 and June 2017 opinion statements together, explaining:

> Dr. Kuchynski submitted an assessment of the claimant's functional capabilities dated June 2017 (Ex 46F). The doctor opined that the claimant would be able to lift and carry up to 10 pounds and walk up to two city blocks, however, further opined that the claimant would be able to sit, stand and/or walk for less than two hours, in total, during an eight-hour workday. Dr. Kuchynski went on to opine that the claimant would likely miss more than four workdays per month and also require three to four breaks throughout the workday to lie down for about 20 to 30 minutes. In addition, Dr. Kuchynski completed another form in May 2012 stating that the claimant carried a lupus diagnosis and indicated numerous symptoms that the claimant experienced including abdominal pain, rashes, joint pain, fatigue, neuropathy and memory loss (Ex 6F). The doctor noted that the claimant had difficulty performing her activities of daily living and that it took her longer to complete tasks due to deficiencies in concentration, persistence or pace.

> I give little weight to both opinion statements forwarded by Dr. Kuchynski as the opined restrictions generally overstate the claimant's limitations as supported by the overall record. The doctor limits the claimant's ability to walk but the record indicates that she walks further for exercise. The claimant manages her own household chores, including laundry, driving, grocery shopping, and cooking, indicating that she is not as limited as opined by Dr. Kuchynski's opinion statements. Furthermore, the doctor's own notes consistently note that the claimant's condition is stable. For these reasons I give little weight to [the] opinions despite her being a treating source whose opinion is potentially entitled to controlling weight. However, based on the discussion above, Dr. Kuchynski's opinions are inconsistent with the record and not supported by her own treatment notes, and thus, not entitled to controlling weight.

(Tr. 28).

The ALJ thus gave two reasons for discounting Dr. Kuchynski's opinion: 1) inconsistency with the record as a whole (specifically, Plaintiff's own reported activities), and 2) inconsistency with the physician's own statements that Plaintiff's condition is "stable." *See id.*

First, the ALJ cited Plaintiff's ability to perform various daily activities as inconsistent with Dr. Kuchynski's opinion. Plaintiff correctly contends that such "[b]rief or intermittent activities of daily living do not equal the ability to perform work activities during an eight-hour workday". (Doc. 15, at 14). But the ALJ did not so find. Rather, he cited Dr. Kuchynski's opinion that Plaintiff would be able to sit, stand and/or walk for less than two hours *total* in an eight-hour workday (Tr. 27), and then cited Plaintiff's daily activity abilities as "indicating she is not as limited as opined by Dr. Kuchynski's opinion statements" (Tr. 28) (noting, *inter alia*, that Dr. Kuchynski's opinion "limits the claimant's ability to walk but the record indicates that she walks further for exercise" and that Plaintiff "manages her own household chores, including laundry, driving, grocery shopping, and cooking, indicating that she is not as limited as opined by Dr. Kuchynski's opinion statements."). That is, the ALJ did not find that Plaintiff's ability to perform these activities – in and of themselves – indicated she could perform full time work, but rather (accurately) cited them as inconsistent with Dr. Kuchynski's opinion. Such an inconsistency is a valid reason to discount opinion evidence.

Plaintiff further contends that the activities cited by the ALJ do not conflict with Dr. Kuchynski's opinion that Plaintiff required frequent breaks, the ability to switch positions, or would miss work. (Doc. 15, at 14-15). However, the ALJ elaborated about Plaintiff's activities two paragraphs later, explaining:

> The claimant reports that [she] has volunteered at her church during the relevant period and has also acted as a caregiver on a fulltime basis (*see* Ex 44F). The record does not contain many specifics about such volunteer activities, however, the claimant did state that she drives about two to three hours each day and the

indication is that it was on a fulltime basis. She also reported in late 2015 that she babysits a three-year old toddler several times a week. (*see* Ex. 20F:2). In addition, the claimant manages the majority of her own household chores independently, including grocery shopping. While these factors are not determinative of the issue of disability, they do indicate that the claimant has a greater capacity than alleged.

(Tr. 28). This discussion is supported by the record (*see* Tr. 53-56, 87, 1100, 1524, 1526), and lends further support to the ALJ's statement that Plaintiff's daily activities are inconsistent with Dr. Kuchynski's opinion. That is, the undersigned finds ALJ reasonably concluded that Dr. Kuchynski's opinion was disproportionate to Plaintiff's overall record of activities. Moreover, to the extent the ALJ did not specifically discuss the limitations noted by Plaintiff, the undersigned notes this was not the only reason the ALJ provided.

Second, the ALJ discounted Dr. Kuchynski's opinion because she repeatedly described to Plaintiff's condition as "stable". (Tr. 28). She explained "*based on the discussion* above, Dr. Kuchynski's opinion are inconsistent with the record and not supported by her own treatment notes[.]") *Id.* (emphasis added). Plaintiff contends that "the ALJ's assumption that 'stable' systemic lupus erythematosus contradicted Dr. Kuchynski's opinion is unsupported and mischaracterizing." (Doc. 15, at 15). However, contrary to Plaintiff's assertion that "[t]here is no further explanation by the ALJ", three pages prior, the ALJ explained his consideration of Dr. Kuchynski's underlying treatment notes in greater detail:

> Throughout the course of the relevant period, the claimant's condition has been generally sta[b]le. Dr. Kuchynski has generally noted this as well, reported that the lupus is, in fact, stable, and that the claimant had reported no worsening stiffness, swelling, or new joint pain. In addition, throughout her follow up visits, the claimant has generally reported only morning stiffness and localized joint pain with swelling, but no back pain, no muscle weakness and no arthralgias and the examinations showed pitting edema of the bilateral ankles and knees, but no joint swelling and she was noted to have a normal gait (*see* Ex 16F).

> Although the claimant's condition is generally stable, she does experience exacerbations at times as well; however, based on the record, such exacerbations

are not frequent. As stated, Dr. Kuchynski generally notes the lupus as stable. The claimant's lupus related symptoms include joint pain and nerve pain.

(Tr. 25-26). An ALJ may properly reference earlier-discussed inconsistencies without repeating the prior analysis. *See, e.g.*, *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) (ALJ's decision to reject medical opinion, determining it was not supported by the objective medical evidence in the record "as discussed above", was not error). And the ALJ's analysis of Dr. Kuchynski's records is supported by substantial evidence as Dr. Kuchynski repeatedly noted normal findings on examination and noted Plaintiff's lupus to be stable. *See* Tr. 682 (lupus stable but for sensitivity to bright lights and loud noises); Tr. 438, 444, 674, 676 (medications working to keep symptoms under control), Tr. 437-38, 668 (lupus "stable on therapy"); Tr. 647-48, 1171-73 (normal physical examination and lupus stable), Tr. 636 (lupus stable and neuropathic pain starting to respond to gabapentin).

The ALJ also recognized that although Plaintiff's lupus was "generally stable, she does experience exacerbations at times as well." (Tr. 26). He correctly noted, however, that "based on the record such exacerbations are not frequent." *Id.*; *see* Tr. 674 (neuropathy pain lessening on medication); Tr. 445 (neuropathy pain "slowly improving"); Tr. 444 (neuropathy pain lessened); Tr. 668 (Plaintiff reported she thought she had a flare two months prior); Tr. 864 (increased nerve pain); Tr. 636 (neuropathic pain "starting to respond to gabapentin"). Moreover, there are multiple notations in the record to stable lab results. *See* Tr. 920-21, 1301, 1314.

In her brief, Plaintiff asserts the ALJ erred because "Plaintiff's 'stable' lupus still causes memory deficits and pain; as it is *unchanged*, not without issues." (Doc. 15, at 16) (footnotes omitted). However, with regard to Plaintiff's assertion regarding memory deficits, the ALJ addressed Plaintiff's asserted mental limitations, noting, *inter alia*:

> She does mention memory loss to her treating providers throughout the course of the relevant period, however, is not treated for this condition/symptom and is not referred for further evaluation or specialized care. In fact, other than merely noting the claimant's complaint regarding memory loss, there is no significant attention given to this issue.

(Tr. 22). The ALJ then summarized the June 2012 consultative examination with Dr. Magleby and December 2015 consultative examination with Dr. Benson-Blankenship, assigning both great weight and finding that Plaintiff had no more than mild limitation in any work-related area of mental functioning. (Tr. 22-23). Plaintiff does not present any developed argument to contest this determination, or argue that the ALJ should have included mental limitations in the RFC, but rather argues that the ALJ somehow erred in failing to recognize that her "stable" lupus could still cause memory deficits. The Sixth Circuit has held that "[t]he mere diagnosis of [an impairment], of course, says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). And Plaintiff fails to point to anything not considered by the ALJ support her statement that her lupus caused memory difficulties. To the extent she argues her "stable" lupus also continued to cause pain, this was recognized, and accommodated by the ALJ's restrictive RFC. *See* Tr. 24.

Although the ALJ discounted Dr. Kuchynski's opinion, his decision to do so was based on the *degree* of limitation opined, not on a finding that Plaintiff's lupus caused *no* limitations. *See* Tr. 28 ("the opined restrictions *generally overstate* the claimant's limitations as supported by the overall record") (emphasis added). And, as noted above, the Sixth Circuit has held that "[t]he mere

diagnosis of [an impairment], of course, says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.The ALJ's analysis speaks to the consistency of Dr. Kuchynski's very limiting opinion with the record as a whole, including the doctor's own treatment notes. 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). This is a good reason to discount a treating physician's opinion. *See, e.g.*, *Lunsford v. Comm'r of Soc. Sec. Admin*, 2018 WL 4145014, at *7 (N.D. Ohio) ("The ALJ gave "good reasons" when she remarked that Dr. Wilson's opinion is inconsistent with and unsupported by his own treatment notes. . . . In other words, nothing that Dr. Wilson observed or recommended during his treatment of [the claimant] matched how severely limited Dr. Wilson opined Lunsford to be in the sheet he filled out for [the claimant's] disability application."); *Grear v. Colvin*, 2014 WL 6473282, at *6 (N.D. Ohio) ("The ALJ's finding, that [the physician's] own treatment notes did not support the functional limitations she assessed, is an accurate description of the treatment notes and constitutes a good reason for rejecting [the physician's] unsupported opinions."), *reported and recommendation adopted sub nom.*, *Grear v. Comm'r of Soc. Sec.*, 2014 WL 6473279.

Taken together, the Court finds the ALJ's discussion of Plaintiff's daily activities, and (more importantly) the inconsistency of Dr. Kuchynski's treatment notes with the severity of her opinion provided the required "good reasons" for discounting that opinion. That is, the provided reasons, particularly taken in context of the surrounding text, are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *4.

<u>Plaintiff's Other Arguments</u>

Plaintiff also argues the ALJ erred by giving more weight to the non-treating state agency physicians who did not review a complete record. Further, she alleges the ALJ "played doctor" by limiting Plaintiff further in the RFC than these physicians opined without a medical basis.

"The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. § 416.946(c)). An ALJ's RFC determination must be supported by evidence of record, but it need not correspond to, or even be based on, any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Instead, it is the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of record, medical and otherwise. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013); *see also Poe*, 342 F. App'x at 157 ("Moreover, an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."). Additionally, an ALJ may rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating his opinion. *See, e.g.*, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that was developed post-dating those opinions); *Ealy v. Comm'r of Soc. Sec.*, 594 F3d 504, 513 (6th Cir. 2013) ("Even if [a State agency physician's] RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them."); *Patterson v. Comm'r of Soc. Sec.*, 2017 WL 914272 at *10 (N.D.

Ohio) ("ALJ may rely on a state agency reviewer who did not review the entire record, so . . . long as the ALJ also considers the evidence post-dating the opinion.").[2]

This is precisely what the ALJ did here. The ALJ explained his consideration of the State agency physician opinions:

> I have also considered the opinions of the State Agency medical file consultants who reviewed the evidence relating to the claimant's physical complaints. The consultants opined that the claimant would be capable of a light exertional level with additional postural and environmental limitations. I give partial weight to such opinions as they are generally supported and consistent with the evidence available at that time. However, based on medical evidence of record available at the hearing level, I find the claimant to be capable of only a sedentary exertional level.

(Tr. 28). The State agency opinions were offered in November 2015 (Tr. 94-96) and April 2016 (Tr. 111-13), respectively. It is worth repeating that Plaintiff's date last insured was December 31, 2016, just eight months after the second State agency opinion. The ALJ considered subsequent evidence of record . *See* Tr. 26 (citing 2016 and 2017 physical therapy records); Tr. 27 (citing December 2016 and March 2017 neurologist visits). And Plaintiff presents no specific argument that any later evidence demonstrates she is more restricted than the ALJ found.

Plaintiff is correct that, in addition to being more restrictive than the state agency opinions by limiting her to sedentary, rather than light work, the ALJ's RFC contains more restrictive postural restrictions. To repeat what is stated above, the State agency physicians opined Plaintiff could frequently climb ladders, ropes, and scaffolds, frequently kneel, and occasionally stoop,

---

2. The undersigned finds Plaintiff's citation to *Godbey v. Colvin*, 2014 WL 4437647 (W.D. Ky.), distinguishable. There, the court found a "substantial amount of new medical evidence" regarding Plaintiff's impairment submitted after an Appeals Council remand, which a State agency physician did not have the opportunity to review. *Id.* at *8. By contrast here, there was not a substantial amount of new medical evidence between Dr. Gallagher's April 2016 opinion (Tr. 111-13) and Plaintiff's December 2016 date last insured. In fact, other than a general objection that the ALJ must have "played doctor", Plaintiff does not offer a specific argument as to what post-dated evidence should have changed the ALJ's analysis.

crouch, and crawl. (Tr. 94-96, 111-13). They found Plaintiff had no limitations in climbing ramps or stairs or balancing (Tr. 94-95, 112). By contrast, the ALJ limited Plaintiff to sedentary work with slightly different postural limitations: never climb ladders, ropes, and scaffolds; occasionally climb ramps and stairs; frequently balance; and occasionally stoop, kneel, crouch, and crawl. (Tr. 24). And, Plaintiff is correct that the ALJ did not explain these more restrictive limitations beyond his general statement that "based on medical evidence of record available at the hearing level, I find the claimant to be capable of only a sedentary exertional level" (Tr. 28). *See* Doc. 15, at 17 ("The ALJ does not explain why he added restrictions such as never climbing ladders, ropes or scaffolds, occasionally climbing ramps and stairs; frequently balance; and occasionally kneel[.]").

However, Plaintiff fails to explain how the ALJ's decision to adopt a *more* restrictive RFC than the Stage agency physicians opined – even without an explanation – is harmful error. If anything, the ALJ's RFC (as compared to that of the State agency physicians) made it more likely that Plaintiff would be deemed disabled. *See, e.g.*, *Ferris v. Comm'r of Soc. Sec.*, 2017 WL 5187796, at *11 n.4 (N.D. Ohio) ("Because his RFC determination was more restrictive than the opinions expressed by non-examining state agency physicians, the ALJ's departure from their opinions was, at most, harmless error.") (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *Malone v. Comm'r of Soc. Sec.*, 2017 WL 9485649, at *14 (N.D. Ohio) ("Because the ALJ found that plaintiff's RFC was more restricted than had the state-agency reviewing physicians, his assignment of no weight to their opinions was harmless."), *report and recommendation adopted*, 2017 WL 2821449. Moreover, the ALJ's finding that Plaintiff was limited to sedentary work – as opposed to light work as opined by the State agency physicians – was more consistent with her testimony that she had difficulty lifting heavier objects. (Tr. 56, 59); *see* 20 C.F.R. § 404.1567(a)-(b) (sedentary work requires "lifting no more than 10 pounds at a time"; light work involves "lifting

no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").

For these reasons, the undersigned finds no error in the ALJ's decision. The ALJ provided the regulatory-required "good reasons" for discounting Dr. Kuchynski's opinion. And the ALJ's RFC determination is supported by substantial evidence in the record.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

 s/ James R. Knepp II
United States Magistrate Judge